UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br> Plaintiff,<br> vs.<br><br>FRANK RICHARD AHLGREN, III,<br><br> Defendant. | Case No. A-24-CR-31-RP |

## **UNITED STATES' SENTENCING MEMORANDUM**

Frank Richard Ahlgren, III, an early investor in Bitcoin, defrauded the United States of more than $1 million in taxes by filing false tax returns that underreported gains from the sale of over $4 million worth of bitcoin. Not only did Ahlgren lie to his accountant to conceal his gains, Ahlgren took sophisticated steps to conceal his transactions on the Bitcoin blockchain through the use of mixers and peer-to-peer cash exchanges. Indeed, Ahlgren took the additional step to conceal his transactions by structuring his cash deposits to conceal the money he earned from those transactions. As an early investor who was also a Bitcoin blogger, Ahlgren knew how to conceal his transactions, and he took the necessary steps to hide his sales.

This is the first criminal tax case that charged an individual who filed false tax returns that underreported and did not report gains from the sale of cryptocurrency. As the price of cryptocurrencies, especially Bitcoin, have surged, more cryptocurrency investors are selling and making substantial gains. Such investment activities often trigger tax reporting and payment obligations. The Wall Street Journal recently published an article about the surging price of Bitcoin and highlighted the conviction of Ahlgren as a warning to investors that there are consequences

for willfully lying on your tax returns.[1] The voluntary tax system in this country relies on individuals to be honest on their filings with the IRS. Ahlgren willfully violated that trust for personal greed and attempted to get away with it by exploiting the anonymity that Bitcoin affords. For this conduct, he should be punished with a prison sentence. Moreover, the facts of this case present an opportunity for this court to send a necessary and powerful message of deterrence to both Ahlgren and virtual currency investors: underreporting and omitting the sale of your cryptocurrency to defraud the government will land you in federal prison. For these reasons, the United States requests that this Court sentence Ahlgren to 27 months in prison.

## I. BACKGROUND

### A. Background on Bitcoin

To assist the court in understanding the transactions at issue, a basic primer on cryptocurrency follows. Cryptocurrency is a digital currency that is decentralized and used for encrypted peer-to-peer financial transactions that are not based on a central bank. This digital money is not backed by "physical commodities or sovereign obligation." *United States v. Sterlingov*, ___ F. Supp. 3d ___, 2024 WL 860983, at *2 (D.D.C. Feb. 29, 2024). "Although other cryptocurrencies exist, Bitcoin is the most popular." *Id*.

"Bitcoin is a decentralized form of electronic or digital currency that exists only on the [i]nternet." *United States v. Lord*, 915 F.3d 1009, 1013 n.1 (5th Cir. 2019); *see also United States v. Gratkowski*, 964 F.3d 307, 308 (5th Cir. 2020). Like other cryptocurrencies, Bitcoin is not issued by any government, bank, or company, but rather controlled through computer software operating via a decentralized, peer-to-peer network. *See United States v. Brown*, 857 F.3d 334, 337 (6th Cir.

---

[1] Bitcoin Is Surging, and the IRS Is Watching Closer Than Ever, https://www.wsj.com/personal-finance/taxes/the-hardest-part-of-cashing-in-bitcoin-is-getting-the-taxes-right-88f85487

2017) (defining bitcoin as "a virtual, sovereign-free currency"). The term 'bitcoin' refers to both a system and a unit. Each unit of currency on the "Bitcoin" system (referred to with a capital B) is called a "bitcoin" (referred to with a lowercase b). *United States v. Harmon*, 474 F. Supp. 3d 76, 80–81 (D.D.C. 2020).

Bitcoin is a peer-to peer, network-based medium of value or exchange that may be used as a substitute for currency to buy goods or services or exchanged for currency or other cryptocurrencies. Individuals can obtain bitcoin through several avenues, including from exchanges, directly from other people, and by a process called mining. To conduct transactions on a blockchain, an individual must use a Bitcoin address which was also referred to as a public key. *Harmon*, 474 F. Supp. 3d at 81. A Bitcoin address is akin to a bank account number and consists of a string of more-than-25-character-long, case-sensitive letters and numbers. *Id.* Bitcoin addresses are controlled through the use of a unique corresponding private key. *Id.* This private key is the equivalent of a password and is necessary to access the bitcoins associated with a Bitcoin address. Only the holder of an address's private key can authorize the transfer of bitcoin from that address to another address. *Id.* at 81-82 (describing the verification process). Typically, bitcoin is stored in a virtual account called a wallet which is a software program that keeps track of an individual's public addresses and corresponding private keys.

All Bitcoin transactions are recorded on what was known as the Bitcoin blockchain. The blockchain records "only the sender's address, the receiver's address, and the amount of Bitcoin transferred," not the private keys associated with the sender or recipient. *Gratkowski*, 964 F.3d at 309. As a result, the "owners of the addresses are anonymous on the Bitcoin blockchain." *Id.* Despite this anonymity, "it is possible to discover the owner of a Bitcoin address by analyzing the blockchain." *Harmon*, 474 F. Supp. 3d at 82. Chainalysis and similar blockchain analytics

companies are in the business of analyzing the Bitcoin blockchain and assist investigators in discovering the true owners of a Bitcoin address. *Sterlingov*, 2024 WL 860983, at *6. The process of analyzing the Bitcoin blockchain is commonly referred to as "tracing."

### B.    Principles of Taxation on Bitcoin

When a taxpayer sells cryptocurrency, including bitcoin, the taxpayer has to report sales proceeds and any gains or losses from the sale of the cryptocurrency on their tax return.[2] To determine the gain or loss from the sale, the taxpayer subtracts their basis from the sales proceeds. The basis is generally the price that the taxpayer paid to purchase bitcoin. The difference between the two is the gain or loss. A taxpayer is required to report sales proceeds and any gains or losses from the sale of cryptocurrency on an IRS Form 8949, Sales and Other Dispositions of Capital Assets. The totals from the IRS Form 8949 flows onto the taxpayer's Schedule D, Capital Gains and Losses. Both the IRS Form 8949 and Schedule D are attached to the taxpayer's Form 1040, U.S. Individual Income Tax Return.

### C.    Procedural Background

On February 6, 2024, Ahlgren was indicted and charged with three counts of willfully making and subscribing a false tax return and four counts of structuring transactions to evade the reporting requirement of financial institutions. (PSR ¶ 1).

On April 9, 2024, Ahlgren had his initial appearance and was ordered detained pending trial. (PSR ¶ 3). Ahlgren was already detained in a separate state matter after a Texas state court judge found him in civil contempt for failing to comply with various state orders, including one that required him to produce his cryptocurrency wallets. (ECF No. 5). Magistrate Judge Susan Hightower ordered him detained in this matter due to a serious risk of flight. *Id*. At the detention

---

[2] IRS Notice 2014-21, https://www.irs.gov/pub/irs-drop/n-14-21.pdf.

hearing, the Government introduced evidence that Ahlgren had access to millions of dollars in bitcoin and had strong ties to El Salvador. *Id*.

On September 12, 2024, Ahlgren pleaded guilty to Count 1 of the Indictment, which charged him with willfully making and subscribing a false tax return, in violation of 26 U.S.C. § 7206(1). (PSR ¶ 2).

### D.    Factual Background

#### i.    Tax Year 2017

Ahlgren, an avid proponent of Bitcoin, started purchasing bitcoins as early as 2011. (PSR ¶ 7). In 2015, Ahlgren purchased approximately 1,366 bitcoins using his accounts with Coinbase. *Id*.; Exhibit 1.[3] The highest value that Bitcoin sold for in 2015 was approximately $495.56. (Exhibit 1). On October 23, 2017, Ahlgren sold approximately 640 bitcoins worth approximately $5,807.53 per bitcoin for a total of approximately $3.7 million. (PSR ¶¶ 11, 12, 13). Ahlgren used funds from the sale of the bitcoins to purchase a house in Park City, Utah, a photograph of which is contained in Exhibit 2. The majority of the bitcoin Ahlgren used to purchase the house came from bitcoins that Ahlgren purchased in 2015. (PSR ¶ 13). Ahlgren earned substantial gains on the bitcoins he sold to purchase the Park City house. To offset those substantial gains, Ahlgren filed a return that falsely inflated his cost-basis of those bitcoins to falsely lower his tax liabilities. (PSR ¶ 12).

Soon after the purchase of his Utah residence, Algren contacted his accountant and tax preparer, Ed Gowett. *Id*. Ahlgren knew that he owed substantial taxes on the gains he obtained from selling the bitcoins to purchase the Park City house. Indeed, in October 2017, Ahlgren informed Gowett of his purchase of the Park City, Utah home and stated that it was going to be "a

---

[3] Exhibit 1 is a summary exhibit that shows the high and low prices bitcoin sold between 2015 through 2017, when Ahlgren purchased the Park City, Utah home.

long-term capital gain issue," acknowledging that he will "definitely [be] writing a fairly large check to the Treasury Department." (Exhibit 3 at 2). Gowett responded "for some transactions there may be *best recollection and estimates* to determine cost basis. What is important to report goes a long way in the event the IRS ere to ever question . . . *[G]ood faith effort by the taxpayer to report* and have some level documentation is the best route to take." *Id.* at 1 (emphasis added).

Ahlgren ignored his accountant's instructions to be honest with the IRS. Instead, Ahlgren prepared and submitted to Gowett a false summary of his purported gains and losses from the sale of bitcoin. In that summary Ahlgren substantially inflated the cost-basis of the purchase of the bitcoin in order to reduce his taxable income and, in turn, pay less in taxes. (Exhibit 4). For example, the summary misrepresented that the 544 bitcoins used to purchase the house were from short-term sales when in fact the majority of the bitcoin used to purchase the house were obtained in 2015 and should have been considered long-term sales. (PSR ¶ 13). The spreadsheet also falsely reported that Ahlgren purchased many of the bitcoins at prices that exceeded the highest price sold on the market prior to the purchase of the Utah house. *Id*. For example, although the highest price that Ahlgren could have paid for any bitcoin in 2015 was $495.56, Ahlgren falsely represented that he purchased some of the bitcoins at $9,470 which was almost twenty times the most expensive price of bitcoin in 2015.

Based on the false information that he received from Ahlgren, Gowett prepared a tax return that was signed by Ahlgren. (PSR ¶ 12). The return was false by underreporting Ahlgren's capital gains, overreporting Ahlgren's cost basis of short-term transactions in bitcoins, and underreporting Ahlgren's gain of long-term transactions in bitcoins. *Id*. These falsities resulted in less taxes paid by Ahlgren. Had he accurately reported his bitcoin transactions to the IRS, Ahlgren would have owed an additional $1,095,031 in taxes.

ii.    *2018 and 2019 Tax Years*

In 2018, Ahlgren sold approximately 38 bitcoins worth a total of approximately $398,000 to purchase gold coins. (PSR ¶ 16). Again, Ahlgren knew he had to report the sale of his bitcoin as a gain or loss on his tax return. In correspondence between Ahlgren and Gowett, Gowett expressly reminded Ahlgren that Ahlgren had to report the sale of bitcoins to purchase gold as a capital gain or loss. (PSR ¶ 16). Ahlgren failed to report the proceeds from these sales on his 2018 tax return, which reported no long-term gains. *Id*.

In April 2018, Ahlgren sold approximately 13 bitcoins to an individual who paid a total of approximately $125,000 in cash. *Id*. Ahlgren met this individual in person and conducted a peer-to-peer transaction. This was done by transferring his bitcoins to the individual, in a process that takes about ten minutes. Upon completion, the individual gave Ahlgren cash equivalent to price that the bitcoins were trading on that day. *Id*. By conducting a peer-to-peer transaction in cash, instead of conducting the transaction on an exchange, such as Coinbase, or through a service, such as BitPay, Ahlgren was able to conceal that he was involved in the sale of bitcoins. Ahlgren also did not report these cash sales on his 2018 tax return. *Id*.

In 2019, Ahlgren conducted additional cash sales where he sold at least 29 bitcoins to the same individual for a total of approximately $170,000 in cash. (PSR ¶ 17). Again, Ahlgren failed to report these cash sales on his 2019 tax return. Moreover, he lied to his accountant about the source of multiple large cash deposits—all slightly under $10,000—into his bank accounts. *Id*. Ahlgren lied to Gowett when he falsely stated that he had no cryptocurrency transactions this year. Not only did Ahlgren lie to his accountant, but he also structured his cash deposits to conceal his transactions. Ahlgren made multiple cash deposits under $10,000 at his bank to avoid raising any "red flags" with financial institutions and to avoid the filing of CTRs which would record his cash

transactions and trigger closer scrutiny of his conduct. (PSR ¶¶ 17, 18). Ahlgren filed a false 2019 tax return that fully omitted any reference to his sale of bitcoins and his receipt of hundreds of thousands of dollars of cash in the sales to the individual. (PSR ¶ 19).

### iii.     Tracing and Tax Loss

Chainalysis expert, Elixabeth Bisbee, traced the cryptocurrency in this investigation.[4] Bisbee is employed at Chainalysis which is a cryptocurrency-investigations firm that uses data on the blockchain to trace cryptocurrency transactions and to assist in identifying individuals involved in particular digital assets. Bisbee produced an expert report on the blockchain analysis and flow of bitcoin related to Ahlgren. Her report traced the bitcoins Ahlgren used to purchase the Park City house, the bitcoins he sold to the individual for cash, and the bitcoins used to purchase gold.

Bisbee used a software program called Chainalysis Reactor which is an industry standard software program used to trace the blockchain and produce a graphical representation of that tracing. *United States v. Sterlingov*, No. 21-cr-399, 2024 WL 860983, at *2 (D.D.C. Feb. 29, 2024) (after conducting an extensive hearing, finding that the tracing and clustering produced by Chainalysis Reactor software was reliable and admissible under the *Daubert* factors). Bisbee produced two graphical charts that demonstrate the tracing. Exhibit 5 depicts the transactions related to the purchase of the Park City, Utah residence and Exhibit 6 depicts transactions related to the purchase of the Park City house and the cash sale transactions in 2018 and 2019.

Brisbee used a method called "clustering" to group together various wallets and public addresses that were attributed to Ahlgren. A cluster of Bitcoin addresses are ones that demonstrate spending by one individual, *i.e.*, addresses that are observed to be on the same input side of a

---

[4] A federal district court recently conducted a *Daubert* hearing over tracing completed by Bisbee using Chainalysis' programs and found that her proposed testimony and use of Chainalysis' programs would be proper to admit at trial. *Sterlingov*, 2024 WL 860983.

transaction because they are highly likely to be controlled by the same entity. Bisbee also clustered addresses where there was other attribution evidence that Ahlgren controlled the addresses, such as account evidence from Coinbase, Mount Gox, local bitcoins, witness interviews, and search warrant evidence ("Granny Wallets") – all of which pointed to Ahlgren as the owner.

a.  Park City, Utah House

With respect to the purchase of the Utah residence, Bisbee traced the approximately 640 bitcoins that Ahlgren transferred to BitPay and used to purchase the Park City property. The tracing showed that in 2015, Ahlgren purchased approximately 1,300 bitcoins using his Coinbase account. The cost he paid was less than $500 per bitcoin.[5] Bisbee used the Chainalysis program to prepare a graphical representation of the flow of bitcoin. (Exhibit 5). For instance, the graph traces that Ahlgren sent approximately 493 bitcoins from the Coinbase accounts that he controlled through multiple wallets, including the Liquid Wallet, Intermediary Liquid Wallets, and Coinbase Withdrawal wallets, that eventually went to the BitPay used to purchase the Park City house.

As to the remaining 147 bitcoins, Bisbee traced 58 from the Granny wallet which Ahlgren controlled and 56 from ShapeShift. The Granny wallet received bitcoins from multiple sources, including local bitcoins and Mount Gox. The 56 from ShapeShift were bitcoins that Ahlgren obtained from converting Bitcoin Cash to Bitcoin. Ahlgren received the bitcoin cash due to a hard fork/airdrop that occurred on August 1, 2017. The remaining 31 bitcoins came from ShapeShift.[6]

The tax loss caused by Ahlgren's failure to honestly report his gains from the bitcoin sales was $1,095,031. (PSR ¶ 20). Ahlgren agrees with the tax loss. As explained in the next two

---

[5] In August 2015, Ahlgren sold a property in Austin, Texas which yielded a gain of over $600,000. Ahlgren used about $335,000 of the funds to purchase approximately 1,300 bitcoins at prices below $500.

[6] The origins of these 31 bitcoins were not able to be determined from tracing.

sections, the IRS did not compute a tax loss for the 2018 and 2019 tax years due to the complexity

of the Bitcoin transactions by Ahlgren, especially his use of joiners and mixers.

b.   <u>2018 and 2019 Tax Years</u>

In 2018 and 2019, Ahlgren sold bitcoin to an individual on multiple occasions and in 2018,

sold bitcoin to purchase gold. As with the sale of the house, Bisbee traced the flow of bitcoins

from Ahlgren to the individual to compute the tax loss. (Exhibit 6). In Exhibit 6, the Binance

Deposit Circle represents the wallets controlled by Individual A. The clusters that sent the bitcoin

to Individual A are labeled Self CoinJoin Mixer and Self CoinJoin Mixer 2. Bisbee discovered

approximately 68 bitcoins transferred from those clusters that sent the bitcoin to Individual A. The

dates and amount of bitcoins transferred corresponded with large deposits of cash into Ahlgren's

bank accounts.

By using the CoinJoin mixer, Ahlgren intentionally attempted to defeat the ability of

programs like Chainalysis to trace and cluster transactions to a particular owner. Bisbee explained

in another case that:

> "Coinjoin" services, however, permit individuals to contribute bitcoin to each
> other's transactions, without sharing their private key information with one another,
> thereby defeating (or at least frustrating) the assumption that when multiple
> addresses fund a single transaction, they are controlled by one entity. See Dkt. 149-
> 1 at 3 (Bisbee Decl.). In response to the advent of coinjoin services, law
> enforcement clustering products like Chainalysis's Reactor and Ciphertrace's
> Inspector, in turn, have developed (or have attempted to develop) methods of
> detecting the presence of coinjoin services. See id. ("Chainalysis has controls in
> place to detect CoinJoin and can skip the CoinJoin co-spends so the addresses are
> not clustered/associated.").

*Sterlingov*, 704 F. Supp. 3d at 179. The idea of clustering relies, in part, on grouping various

addresses that are joined together to send bitcoin in the same transaction. That grouping is based

on the idea that the bitcoins that comes together for one transaction, such as buying a house, are

10

from the same person. CoinJoin services are designed to defeat the basic notion of clustering by taking bitcoins from multiple people and sending it to multiple places.

Ahlgren was well aware of and capitalized on the ability to mix bitcoin using services like CoinJoin to defeat tracing. In May 2014, Ahlgren posted a blog titled "Bitcoin Adoption and Name-Brand Recognition." (Exhibit 7.) In the blog post, Ahlgren explained that he utilized Bitcoin in part because of the anonymity that it affords and that one could further conceal Bitcoin transactions using products such as mixers and tumblers. Due to the use of CoinJoin and the multiple hops prior to the mixing, Ahlgren successfully thwarted the IRS from reliably computing the cost basis for bitcoin sold to the individual.

## I.    Guidelines Calculation

Although the Guidelines are advisory, sentencing courts "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 261 (2005). Thus, at sentencing a court "must first calculate the Guidelines range." *Nelson v. United States*, 555 U.S. 350, 351 (2009). For the reasons set forth below, the sophisticated means enhancement is appropriate in this case. The United States has concerns with whether Ahlgren provided false statements to Probation such that a full reduction for acceptance of responsibility is not warranted.

### A.  Sophisticated Means Enhancement

Ahlgren's intentional use of mixers, multiple hops, peer-to-peer exchanges for cash, and structuring cash deposits into his bank accounts warrants a sophisticated means enhancement. The guidelines provide for a two-point enhancement when "the offense involved sophisticated means." U.S.S.G. § 2T1.1(b)(2). In this context, sophisticated means is defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id*., cmt. 5. The Fifth Circuit has made clear that the sophisticated means enhancement applies when a

defendant takes deliberate steps to make his offense more difficult for the IRS to detect. *United States v. Conner*, 537 F.3d 480, 492 (5th Cir. 2008); *United States v. Wright*, 496 F.3d 371, 379 (5th Cir. 2007). Without a doubt, in this case, Ahlgren engaged in numerous steps to conceal his criminal conduct and to intentionally make it difficult for law enforcement and the IRS to unravel his fraud.

This is particularly the case with respect to Ahlgren's 2018 and 2019 tax returns. First, Ahlgren conducted the cash sale of bitcoins in a manner intended to hide the fact that a sale occurred. He sold the bitcoins, not on an exchange as would be typical, but instead with an individual directly and for cash. As a result, it was difficult to identify the transfer on the Bitcoin blockchain as a sale compared to one of Ahlgren's multiple transfers between wallets that he controlled. Once he obtained the cash, Ahlgren took the additional step of structuring his cash deposits into his bank accounts in order to avoid currency transaction reports. Ahlgren also lied to his accountant about the transaction and cash deposits by claiming that he did not engage in any sale of bitcoin.

Second, Ahlgren took steps in order to make it more difficult for the government to trace and attribute the bitcoin to him. As discussed above, Ahlgren used CoinJoin Mixers whose sole purpose is to hide and conceal the person conducting the transaction. Ahlgren also moved his bitcoin through multiple hops to further complicate the ability of the IRS to trace who owned the bitcoin and when it was obtained. Ahlgren was partially successful in that his steps made it too difficult for law enforcement to reliably calculate a tax due and owing for tax years 2018 and 2019.

Indeed, Ahlgren was well aware of the ability to mix bitcoin using services like CoinJoin to defeat tracing. In May 2014, Ahlgren posted a blog titled "Bitcoin Adoption and Name-Brand Recognition." (Exhibit 7). Ahlgren explained that he utilized Bitcoin in part because of the

anonymity that it affords. He boasted that he knew how to conceal it further by using products such as mixers and tumblers:

> Some claim the Bitcoin block chain is only moderately anonymous, but mixing and tumbling has become widespread and easy – ensuring proper obfuscation. If lack of anonymity has ever been a real problem in the Bitcoin economy, it won't be for much longer.

*Id*. In the face of this evidence, Ahlgren mistakenly contends that sophisticated means does not apply because this enhancement is limited to only the count of conviction, *i.e.* the false 2017 tax return. This argument is simply incorrect. *United States v. Schreiber*, 2000 WL 191853 at *2 (6th Cir. Feb. 10, 2000) (rejecting defendant's argument that the sophisticated means enhancement consideration was limited to only the count of conviction but also included other tax charges).

Pursuant to U.S.S.G. § 1B1.3(a), the relevant conduct provisions require that specific offense characteristics be determined on the basis of, among other things, all acts and omissions of the defendant that occurred during the commission of, in preparation for, or in the course of attempting to avoid detection or responsibility for the offense of conviction. U.S.S.G. § 1B1.3(a)(1) (1993). In addition, the relevant conduct provisions state that when the offense is of a character that grouping of multiple counts would be required under U.S.S.G. § 3D1.2(d), as is required for tax evasion and tax fraud offenses, the relevant conduct includes all acts and omissions of the defendant that were "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2); *see also* U.S.S.G. § 1.B1.3, n.5 (2023). The background commentary provides the following illustrative example: "in an embezzlement case, for example, embezzled funds that may not be specified in any count of conviction are nonetheless included in determining the offense level if they were part of the same course of conduct or part of the same scheme or plan as the count of conviction." U.S.S.G. § 1.B1.3, background (2023). Likewise, courts routinely consider the tax loss from tax years for which a defendant was not

convicted. *See, e.g., United States v. Bolton*, 908 F.3d 75, 95 (5th Cir. 2018) ("The district court may include tax losses in the total loss computation that qualify as relevant conduct under U.S.S.G. § 1B1.3, whether charged or not") (citation omitted).

In this case, the false tax returns for 2018 and 2019, which were the same course of conduct, were properly grouped under § 3D1.2(d). The tax loss from those counts was properly treated as relevant conduct for tax loss purposes. Just as the tax loss would be properly treated as relevant conduct, so too does the conduct from those years support the sophisticated means enhancement.

Moreover, for the 2017 tax year, Ahlgren's movement of bitcoins through multiple wallets prior to consolidating them for the purchase of the home was another method by which he attempted to make it difficult for the IRS to determine a tax loss. The IRS was able, in this case, to determine a loss due to Bisbee's ability to trace the transactions using Chainalysis's program. One only needs to look at the tracing exhibit to see that the tracing was not a simple one hop analysis and without Chainalysis would be extremely difficult to trace. For these reasons, Ahlgren qualifies for the sophisticated means enhancement.

B. Acceptance of Responsibility

The United States has concerns regarding Ahlgren providing false and misleading statements to the Probation Officer and identifying assets to pay restitution and as such, has not moved for a third point for acceptance of responsibility. Pursuant to the plea agreement, the United States may oppose Defendant receiving the maximum applicable downward departure for acceptance of responsibility under § 3E1.1(a) or (b) parties if the Defendant, among other things, "(3) provides false or misleading statements to the Court, the Probation Office, the Pretrial Services Office . . . or (4) does not voluntarily assist the United States in . . . the identification of and recovery of assets to pay restitution as contemplated by the terms of this Plea Agreement."

14

(ECF No. 28 at 7-8). The Fifth Circuit has upheld the Government's decision not to move for a reduction of a third point where, among other things, the defendant did not assist with restitution. *United States v. Halverson*, 897 F.3d 645, 655-56 (5th Cir. 2018); *see also* U.S.S.G. § 3E1.1 cmt. n.1(C); *United States v. Smith*¸ 2003 WL 22408329 at * (5th Cir. Oct. 22, 2003) (unpublished).

According to Bisbee's expert report, after the search warrant was executed on his home, Ahlgren had at least 1,287 bitcoins which he moved through a Wasabi Wallet, another mixer. The United States was not able to trace those bitcoins after it went into the Wasabi mixer. As of April 1, 2021, those bitcoins were worth approximately $76 million and would be worth approximately $123 million as of December 3, 2024. Despite these assets, Ahlgren reported to Probation that he had "no assets." (PSR ¶¶ 71, 75). Neither Ahlgren nor his current wife have provided any explanation as to what happened to the more than $76 million in bitcoin. (PSR ¶¶ 71, 72).

If the bitcoins were converted to cash, that amount of money would not simply disappear. The $76 million dollars would be somewhere. However, the bitcoins could be hidden on the blockchain in cold wallets controlled by Ahlgren but not linked to him, as would a wallet held with an exchange, like Coinbase. Ahlgren has shown an ability and knowledge to use Bitcoin's anonymity properties to conceal his assets. For instance, Ahlgren used mixers and multiple transfers to other wallets in an attempt to conceal his transactions on the blockchain and conducted peer-to-peer transactions. That he has no assets appears to be a false statement to Probation.

Ahlgren stated that he had no assets. If so, then he needed to tell this Court and Probation what he did with the more than $76 million in bitcoins. Ahlgren's conduct with respect to his assets has shown a lack of responsibility by providing false and misleading statements and not identifying assets to assist in payment of restitution. The information would especially be helpful in assisting the United States in its ability to locate assets to recover the over $1 million in restitution that

15

Ahlgren agreed to pay. Accordingly, the United States objects to Ahlgren receiving the full downward departure for acceptance of responsibility.

C. Guidelines Range

The PSR sets forth the guidelines range as follows:

| | |
|---|---|
| Base Offense Level: | 20 (U.S.S.G. § 2T4.1(H)) |
| Sophisticated Means: | +2 (U.S.S.G. §2T1.1(b)(2)) |
| Zero-Point Offender: | -2 (U.S.S.G. §§ 4C1.1(a) and (b)) |
| Acceptance of Responsibility: | -2 (U.S.S.G. § 3E1.1 (a) and (b)) |
| **Total Offense Level:** | **18** |

The United States agrees with the PSR that the appropriate total offense level is 18.

## II.    The § 3553(a) Factors

While a Guidelines sentence is presumptively reasonable, *United States v. Mares*, 402 F.3d 511, 519 (5th Cir. 2005), sentences must be "sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; to afford adequate deterrence; to protect the public; and to provide the defendant with needed training, medical care, or other correctional treatment. 18 U.S.C. § 3553(a). A sentencing court must also consider factors including (1) the nature of the offense and the defendant's history and characteristics; (2) the kinds of sentences available; (3) the applicable Guidelines range and U.S.S.C. policy statements; (4) the need to avoid unwarranted sentence disparities; and (5) the need for restitution. 18 U.S.C. § 3553(a). The § 3553(a) factors support a prison sentence of 27 months, which is at the low end of the Guidelines range.

Ahlgren's offense is serious. He defrauded the United States out of more than $1 million in a sophisticated and calculated manner. Indeed, Ahlgren took measures to ensure that his bitcoin transactions were difficult to trace and less detectable by employing mixers and joiners. He used these tools to conceal his gains from the government, and to not pay his fair share of taxes. And

he was, to a certain extent, successful. Indeed, by taking steps to complicate the IRS's ability to trace who owned the bitcoin and when it was obtained, IRS was unable to calculate a tax due and owing for tax years 2018 and 2019 with sufficient certainty.

Ahlgren knew exactly what he was doing and intended to cheat on his taxes. In a blog post that he authored in 2013 titled "Should Bitcoin be Legal," Ahlgren wrote that the government disliked cryptocurrency, commenting that "there is the issue of taxing assets that cannot be found…" Exhibit 8 at 1. He wrote:

> Governments are about to lose 90% or more of their ability to collect revenues through taxes. Ultimately, if people can hide their assets and capital flows, where will the government derive its revenue? Taxing real property will only cause flight from those assets. Income will soon be masked, underreported, or hidden outright.

*Id.* at 2. This shows that—as early as 2013—Ahlgren was fully aware of how to use cryptocurrency to cheat on his taxes because it would allow him to mask, underreport, and outright hide his income from the government. And, in turn, avoid paying his tax liabilities.

Tax fraud like Ahlgren's harm every honest, taxpaying citizen. U.S.S.G. § 2T1.1, Background ("Tax offenses, in and of themselves, are serious offenses . . . ."). Our nation's system of tax laws relies on the voluntary compliance of individual taxpayers to accurately report their income. And in fact, the majority of taxpayers do fulfill their legal obligations as citizens by honestly reporting and paying their taxes. However, a persistent subset of the population— approximately 15 percent, based on the latest estimate—do not.[7] The result is a yearly tax gap of more than $688 billion in unreported and uncollected taxes.[8] And this does not represent the full

---

[7] IRS, *Tax Gap Projections for 2022*, Publication 5870 (Rev. 10–2024), available at https://www.irs.gov/pub/irs-pdf/p5870.pdf.

[8] IRS, *IRS updates tax gap projections for 2020, 2021; projected annual gap rises to $688 billion*, IR-2023-187, available at https://www.irs.gov/newsroom/irs-updates-tax-gap-projections-for-2020-2021-projected-annual-gap-rises-to-688-billion.

extent of potential non-compliance, as the projections cannot fully represent noncompliance in some components of the tax system, including issues involving <u>digital assets and cryptocurrency</u>. Because of this noncompliance, law-abiding taxpayers incur the effective equivalent of a $3,000 "surtax" to subsidize tax cheats.[9]

Moreover, it is of particular importance for this Court to impose a sentence that will promote respect for the law and afford adequate deterrence to future criminal behavior. *See* 18 U.S.C. § 3553(a)(2). Indeed, the need for deterrence is heightened in this case because, as discussed above, this is the first case of its kind. Ahlgren is the first individual to be charged for failing to report and underreporting cryptocurrency earnings and gains on his tax returns. The virtual currency community is watching this case.[10] They need to know that if they use virtual currency to cheat on their taxes, they will be punished with prison. Indeed, a term of imprisonment is critical to send this message to those who seek to get rich by cheating the government. Those who voluntarily comply with their tax obligations need to know that the tax laws are enforced. Taxpayers also want to know that those who choose to violate the tax laws, like this defendant, will be punished. The Court must impose a sentence in this case that will cause others to think

---

[9] National Taxpayer Advocate, 2020 Purple Book: Compilation of Legislative Recommendations to Strengthen Taxpayer Rights and Improve Tax Administration, Publication 5286 (Rev. 12-2019), available at https://taxpayeradvocate.irs.gov/Media/Default/Documents/2019-ARC/ARC19_PurpleBook.pdf.

[10] *See, e.g.*, Forbes, *Texas Man who Bought a Home with Bitcoins Charged with Filing False Tax Returns*, available at: https://www.forbes.com/sites/kellyphillipserb/2024/02/08/texas-man-who-bought-a-home-with-bitcoin-gains-charged-with-filing-false-tax-returns/; CBS Austin, Austin Man Facing Federal Charges for Underreporting $4 Million in Bitcoin Sales, available at: https://cbsaustin.com/news/local/austin-man-facing-federal-charges-for-underreporting-4-million-in-bitcoin-sales; 99 Bitcoins, *Who is Frank Richard Ahlgren III? Texas Man Found Guilty of $4M Bitcoin Tax Evasion*, available at: https://99bitcoins.com/news/who-is-frank-richard-ahlgren-iii-texas-man-found-guilty-of-4m-bitcoin-tax-evasion/.

twice before filing a false income tax return in the hope of avoiding their tax liabilities and to line their own pockets at the expense of honest taxpayers.

The Government acknowledges that Ahlgren claims, like many taxpayers, that he has faced hardships in his life. However, criminals like him who have the "education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime." *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999). And Ahlgren's characteristics such as his education and employment speak to his culpability. He has a Bachelor of Science in Business and Finance from the University of Phoenix. He has skills as a computer programmer, received training in information security, and passed the chartered financial analyst exam. (PSR ¶ 64). Moreover, Ahlgren has worked in the "cryptocurrency industry," including setting up virtual machines and wallets, at Whole Foods and Wi-Fi Alliance, and performed work in the real estate business and as a web developer, computer programmer, and partner of "Ahlgren Capital Management." (PSR ¶¶ 66, 67, 68, 69, 70). Ahlgren had legitimate business opportunities and income in his life. And still he engaged in this criminal conduct because he was greedy and did not want to pay his fair share.

Finally, sentencing Ahlgren to a Guidelines sentence of imprisonment, followed by a one year of supervised release, is necessary to avoid unwarranted sentence disparities among defendants who have been convicted of similar conduct. Indeed, in sentencing a defendant to a sentence within a Guideline range, a court necessarily gives significant weight and consideration to the need to avoid unwarranted disparities. *See United States v. Bartlett*, 567 F.3d 901, 909 (7th Cir. 2009). And a Guidelines sentence at the low end is necessary here to satisfy the goals of sentencing. Ahlgren harmed the United States and U.S. taxpayers when he abused cryptocurrency, and hid income from the government. By his conduct, he intentionally avoided paying over $1

million in taxes by underreporting the sale of bitcoin. And he continues to obfuscate the truth when he claims to have no assets. This is the first defendant charged with this type of criminal conduct, and thus Ahlgren's sentencing must send a crystal-clear message: When a taxpayer defrauds the United States by underreporting the sale of his cryptocurrency, there will be serious consequences.

## III.    RESTITUTION

Defendant has agreed, pursuant to 18 U.S.C. § 3663(a)(3) to pay restitution to the IRS for the count of conviction and all relevant conduct with the amount to be determined at sentencing. As set forth in the PSR, the United States agrees with Probation that the requested restitution amount is $1,095,031. (PSR ¶ 14, 88). Ahlgren does not contest the restitution amount.

## IV.    CONCLUSION

For these reasons, the United States requests that the Court sentence Ahlgren to 27 months of imprisonment, followed by one year of supervised release, and order Ahlgren to pay to the IRS restitution of $1,095,031.

Respectfully submitted,

JAIME ESPARZA
UNITED STATES ATTORNEY

By: */s/ Mary Frances Richardson*
Mary Frances Richardson
Trial Attorney
Michael C. Boteler
Assistant Chief
U.S. Department of Justice, Tax Division
William Harris
Assistant United States Attorney

CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which automatically generated a Notice of Electronic Filing to all counsel of record.

                                               /s/
MARY FRANCES RICHARDSON
Trial Attorney
U.S. Department of Justice, Tax Division
Massachusetts Bar No. 706192
150 M Street NE
Washington, DC 20002
202-305-2701
mary.f.richardson@usdoj.gov